Judge LaValle and I are pleased and honored to be joined today by a judge known, I'm sure, to all of you, Judge McMahon, Chief Judge of the Southern District. Thank you for joining us today. Delighted to be here. Thank you for inviting me. The clerk informs me that all parties are present and accounted for, so we will dispense with the calling of the calendar and begin with United States v. Deacumpa. Good morning, Mr. Lee. Long time since I've seen you, at least. Good morning. Good morning. I may please the court. Yan-Chan Lee, Federal Defenders of New York for Appellant Mamadu Deacumpa. Thirty years ago, this court took the extraordinary step of directing all six U.S. Attorney's Offices in the circuit to instruct each line prosecutor that when they ask for a conscious avoidance charge, to make sure to include the actual belief balancing proviso, the proviso that's stating that regardless of anything else, the jury must acquit the defendant if he actually believed that he was not doing anything wrong. Right. Mr. Lee, we know Judge Marrero made a mistake, okay? We know that happened. So let's go on to the consequences of the mistake. Yes. So the question before the court is whether there's prejudice. And we will embrace the plein air standard because the objection wasn't specifically to this language. Everybody made a mistake. Not only was there no objection, but the court had a pretrial conference on the charge. Nobody was sandbagged or surprised. Nobody except the judge maybe was later sandbagged. You were the judge. There was no surprise. You saw this. The defendant objected to the charge and requested that additional language be given. And the judge gave that additional language. But now, after the trial is all over, the defendant comes and says, oh, but the judge should have included other language. Of course the judge should have included other language. But does the defendant have no obligation whatsoever to call a problem to the trial court? Absolutely we do, Your Honor, as did the government. And that's what the plein air standard is for. And so we are here under Rule 52B in which we have to show that the air is plain and that we, instead of the government, we bear the burden of showing prejudice. And we embrace that. There's certainly no, you know, there's no, I don't think there's a basis for alleging that anybody intentionally did it. There's certainly no intent on our part. And we don't think there's any intent on the government's part. It was simply a mistake. And maybe 30 years as a generation, for a while everybody understood this, but at some point this went, you know, went by the wayside and nobody understood this. And so that's why we're here under plein air review. And under plein air review, this court said as recently as Kaiser in 2010, that the question is whether there's a reasonable probability that the air, the legal air, made a difference. And we respectfully submit that it did. In fact, Kaiser broke this down into two separate reasonable probability components. The first is whether there's a reasonable probability that the jury rested on the conscious avoidance theory, the erroneously charged conscious avoidance theory rather than the actual knowledge theory. And then the second, whether under that theory. There was a defendant who had received again and again and again. His attention had been turned to the proposition that he was selling counterfeit. He received cease and desist letters from the manufacturer. He received letters from Customs telling him that there had been seizures of counterfeit merchandise addressed to him. All this stuff called to his attention. Doesn't that make it extraordinarily improbable that he had a firm belief that he believed, oh, no, this is all good stuff that I'm selling? And on top of which, there was the evidence of his conversations with customers in which he assured them that people will think you paid $800. People will think it's stuff from the manufacturer, that you paid $800 for it and you're getting it for $80. Yes, Your Honor. There certainly was evidence. We're not saying that the evidence wasn't sufficient. That's absolutely true. No, no. I'm talking about whether there's anything in the record that could support the proposition. That I could prove that, yes. Yes, Your Honor, I believe so. So the way I'd like the Court to look at this is that this is unlike a typical conscious avoidance case where it's usually, you know, the stuff at issue is either sort of obviously contraband, or if it's not, let's say it's in a sealed container or if it's just checks or cars where you can't, there's no basis to think one way or another whether the stuff is genuine. This is a unique case. Here, by all accounts, the stuff looked genuine. But, Mr. Lee, I'm not suggesting that your client needed to be an expert in the Hermes scarves or whatever he was selling because the stuff looked genuine. Indeed, he touted that to his customers, that the stuff looked genuine. But he was told 50 times that it wasn't genuine. Didn't there come a point, maybe not the first time, possibly not the second time, but by the fourth or fifth time when he needed to make some inquiry in order to? Well, that's what the conscious avoidance charge would allow a jury to convict on. But, again, it's not whether a reason – and this is where the actual belief proviso comes in. It's not whether a reasonable person should believe this or whether you or I would understand this. It's whether this defendant in particular with his particular characteristics would in fact believe that. But one of his characteristics, as Judge Leval points out, is that he got 10 letters from 10 different groups of people, including the customs folks, saying this is fake. I understand, Your Honor. And let me – so let's – there are obviously a bunch of different categories of evidence. Regarding the conversations from the buyers and from the – there was an undercover buyer and a private investigator. I welcome – the government relies on those. I welcome the court to examine those. The undercover is clearly trying to elicit an omission from Mr. Diacupa, and he never makes the omission. All of his statements are entirely consistent with the belief that he is selling genuine goods derived improperly, gray market goods sometimes these are called, refurbished goods, secondhand goods perhaps, return goods, imperfect goods. The fact that he's selling these at a severe discount in itself is certainly not a proof of anything. As for the notices, we'll confront the notices. There's several inferences that have to be made in order to sort of reach the point where we get to the point that Mr. Diacupa actually should have known this. First, they're not addressed to him. Second, we have to assume that he read them, even though they're not addressed to him. Third, we have to assume that he read them and understood them. Again, we welcome the court to look at those notices, full of legalese, citations to the statute. And then finally, I would ask the court to perhaps accept that this immigrant from Africa may have assumed that what he received, so whatever, when he received a seizure notice from the government, that meant that they didn't deliver it to him, okay, so that that was counterfeit. So perhaps the stuff that he did receive, perhaps he reasonably believed that, well, they didn't seize these, maybe these are the genuine ones. And again Mr. Lee, in the minutes you have left before, and you've reserved some time for rebuttal, tell me what we do with the fourth prong of a plain error standard, that the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. Well, Your Honor, you know, there's rarely a detailed examination of that factor. If the court finds prejudice, it's almost as a matter of course that the court will exercise its discretion on the, I think, pretty obvious understanding that if a defendant is prejudiced by a legally erroneous charge, the court should correct it. So it's always discretionary. We accept that. But nonetheless, if the court finds prejudice, I think it would be a highly unusual situation not to grant the relief. So these various factors, sorry, not the factors, these things that my colleagues have been focusing you on and that you've been responding to, we don't take that into consideration? Oh, no, no. I think that's part of the prejudice analysis. If there's no prejudice, then there's certainly no reason to correct anything. Thank you. You've reserved some time for rebuttal. Good morning. May it please the court. My name is Jason Swergold. I'm an assistant United States attorney in the Southern District of New York. I represent the government on appeal, and I represented the government in the district court. And if I may, I'd like to turn right to the evidence in this case that showed that the defendant, Mamadou Diakoumpa Let's start with how come you submitted to the court a conscious avoidance charge that didn't include language which has been said again and again and again and again should be included? Because I made a mistake, Your Honor. And we fully admit that we made a mistake. We embrace the fact that we made a mistake. It's right up front in our brief. After 30 years, I think you can change the form charges in your office so that the one you used, Mr. Swergold, never shows up again. Absolutely, Your Honor. But focusing on the evidence in this case, because the evidence of the defendant's actual knowledge that the goods were counterfeit was overwhelming. And it really does come in multiple different forms, but the most prominent one and the most important one is the defendant's own statements. Because he told multiple people that he thought were customers that these goods would be taken for the real thing out on the street. People would think that you paid the full price for it. Your adversary is saying to us, and he's correct, I think he's correct, that the language used was not necessarily inconsistent with the belief that the goods being sold to that customer were genuine. Well, actually, Your Honor, I think there's- Why is that not correct? Because I think there is a very critical distinction in some of the statements that the defendant made to his purchasers about the quality of the goods. Because what he told his customers was that if you feel the quality, it feels natural. Sometimes the quality talks. It has very nice quality, so if you go outside, people will think you paid this price. If a good is- That demonstrates that he knew they were counterfeit? Yeah. They knew that this particular item was counterfeit? Yes, Your Honor, because if you have an item that was made by the manufacturer but had a small defect on it or came through some other distribution mechanism, you wouldn't have to tell your customers that the quality feels like it's real and feels like it's natural and that the quality talks. You could just tell them that fact. The fact that he is telling them that the quality itself feels natural, can be mistaken for the real thing, demonstrates that he knows that the goods- He said, and this is in Government Exhibit 402, which is a recording, he's talking to the undercover agent here and about the fact that she's buying the goods for her boyfriend, and he says, when you go, quote, when you go, don't tell him. Just say, this is official. Let him feel the quality. It feels natural. Then he later says, very nice quality. You go outside, people think you spend $800 for it. All right, Mr. Schwirbel, granted that you can draw the inference, the jury could have drawn the inference you wanted the jury to draw, that you argued for the jury to draw. Is it the only inference you can draw? Well, Your Honor, I think it is because these statements are not made in a vacuum, because the defendant had received repeated warnings through multiple different channels that the goods that he was selling were counterfeit. So he received the Customs and Border Protection notices. He received an in-person visit from an investigator who told him, you're selling counterfeit goods. You have to stop. Here's a cease and desist letter that made it very clear the word counterfeit was bold, underlined, and in all capital letters. The investigator testified that because he's just a private investigator, he doesn't have a seizure power, and so Mr. Diacumpa actually voluntarily surrendered five counterfeit belts to the investigator on that date. He signed the bottom of the cease and desist letter that said that he had read it and understood it and noted that he was voluntarily turning over five counterfeit belts. Then eight days later, the investigator went back again because he had seen some goods that were there that suggested that there was another manufacturer where there were counterfeit goods, and he needed to get a cease and desist letter from that company. What was the object about which he said it feels natural? He was talking about true religion jeans and T-shirts because the undercover officer started by purchasing items for her alleged boyfriend that were true religion jeans and T-shirts and hats. They then moved to a conversation about Diacumpa's ability to get handbags that she was looking for that he didn't have in the store, and that's when he made further promises about the quality. It feels natural. It feels natural does not self-evidently mean it feels like genuine as opposed to counterfeit goods. When you're talking about jeans and say they feel natural, that can mean a lot of different things. That can mean that they fit comfortably, that they have a nice soft feel, whatever. I don't know. Natural is not a word that ordinarily is used to distinguish between genuine, trademark, and counterfeit. Well, Your Honor, I would submit that you can't look at that in isolation because the full statement is when you go, don't tell him. Just say this is official. Let him feel the quality. It feels natural. So there the reading of natural, what he's saying is he's talking about the goods being real versus not real, not that they fit a certain way. Your focus is really on the word official. Tell him it's official. Your Honor, I think you can take all of the words he says and read them together. He's talking about it being official. He's talking about the quality. He's saying the quality talks. And, again, these statements, especially at this point in time. Why would that not be something that might be said at a salesman at a store that sells things like seconds? Because, again, Your Honor. Things that are genuine but that have been rejected by the manufacturer for sale as first-line goods. Stuff that, I don't know, stuff that's sold at the Century 21. Well, again, Your Honor, by the time that the defendant was making this statement on July 20th, he had already received every single warning that he was going to get in this case. This wasn't something that happened early on in the investigation. He had received the two impression visits. He had received letters from the company in the mail saying that your goods are counterfeit. He had received in-person warnings from an investigator. He had voluntarily turned over counterfeit goods. He had received the Customs and Border Protection notices, some of which were opened. You had a very strong case against him. But on this issue, how clear must it be that there was no prejudice? How clear must it be that he cannot possibly have believed that the goods that he was selling, that the goods covered by the indictment were genuine? Well, again, Your Honor, the standard is whether there was a reasonable probability. And here it's not a reasonable probability because the argument that the defendant makes and that he made at the trial was the goods are hard to tell whether they're real or whether they're fake. And he was not an expert. The government had called Customs and Border Protection import specialists. They had called individuals from the companies to talk about why these goods were counterfeit as opposed to real. And so his argument was, you see, you need a trained expert to be able to tell. But that works for somebody who is coming to it in a vacuum, a customer who's coming upon these goods for the first time and not knowing whether or not these goods are real or fake. He was running the store. He was the one getting all the warnings. He was the one who was setting the prices, who was running it out of the front of a hair salon, who wasn't giving receipts, who had nothing about his operation to suggest that any of these goods actually came from the manufacturer. And, again, I really would point to the fact that all of these warnings started in March of 2015 with things that were in writing, and this was another argument that defense counsel made at the trial was read the language. It's very difficult to tell what it says. There's some legalese. There's references to statutes. But it made very clear that he was breaking the law, that these were counterfeit goods. And then the subsequent letters that he got from the companies were in much plainer English. The words counterfeit were bolded. And then he had people in person explaining it to him. And, critically, the lady who ran the store or who ran the hair salon in the back and rented it out to the front, rented the front of the store out to him, she was there the day that one of the investigators came, and he testified to telling her about why he was there and what was going on with the front of the store. And then she even told the defendant, and they speak the same language. They both spoke French in addition to the fact that the defendant also spoke English. She told him, you have to stop selling these belts, because she understood from talking to the investigator and then reiterated to him that the goods that he was selling was counterfeit. And so, again, while we agree, concede, that there was error, it was our mistake for not introducing a correct charge to Judge Marrero, because we're here on the plain error standard, Diakoumpa cannot demonstrate prejudice to his substantial rights because, and, again, the conscious avoidance piece of it, in closing arguments, the government talked to the jury about conscious avoidance as a fallback argument for one specific piece of evidence, because the overwhelming amount of evidence, all of the other categories that the government claimed went to actual knowledge, were not susceptible to conscious avoidance. And I see I'm about to run out of time. And there was a charge given on actual knowledge. And there was a charge given on actual knowledge, and there's no contention that it was an inaccurate charge. Thank you. Thank you. Mr. Lee, you reserve two minutes for rebuttal. Thank you. Three quick points. First, just at the end here, in Kaiser, this court found plain error, even though the government didn't even argue the conscious avoidance charge, and under the theory that the judge there sort of sua sponte charged it and that that was enough on the facts of that case. And then, most centrally, this idea of, you know, whether there's a reasonable probability that Mr. Diakoumpa believed that these were genuine. The government – these were high-quality fakes, apparently. And the government had to literally call – the government's witnesses were literally 702 experts to be able to discern one from the other. They're very hard to tell. And there's this, you know, misadventure with these $1,300 pair of Balmain jeans that they seized. The government experts even themselves couldn't tell that these were fake. They had to call Balmain in Paris. And I don't know whether they sent the pictures or a copy of the jeans over in order to be able to tell. Mr. Diakoumpa is not an expert, and he is not an insider. I understand this government's argument that he's not a customer. He's the person selling. Fair enough. At some point in the chain of distribution, right, somebody knows they're fake, obviously. The manufacturer knows that he's making fakes. Maybe his partner does. Maybe the person he's giving it to knows. But at some point along the line, the knowledge is lost. And given the similarity, that these goods are substantially indistinguishable from the genuine item, that the differences are so extremely subtle that you need literally a 702 expert to tell the difference, that that, we submit, means that there's at least a reasonable probability, which is not a very high standard. I don't know if we can assign a number to it, but a reasonable probability is something like a, it's certainly less than 50%. It's some basis to believe, again, not that a reasonable person would have believed this, but that this particular defendant with his particular background may have believed this. And given the acknowledged legal error, we submit that we've met the plainer standard. Thank you very much. Thank you. Thank you both. We'll reserve decision.